Rollen F. STEWART, et al., Appellants,

v.

DISTRICT OF COLUMBIA ARMORY
BOARD, et al., Appellees.

No. 88–7067.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 8, 1988.
Decided Dec. 20, 1988.

James J. Knicely, Williamsburg, Va., for appellants.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief for appellees. Donna M. Murasky, Deputy Corp. Counsel, Washington, D.C., also entered an appearance for appellees.

Before WALD, Chief Judge, and STARR and SENTELLE, Circuit Judges.

Opinion for the court filed by Chief Judge WALD.

WALD, Chief Judge:

On January 8 and November 5, 1984, devout football fans were met with a competing religion when appellants, Rollen F. Stewart and Stephen D. Francis, posted large banners reading "John 3:16"[1] on the railings behind the 20–yard line at Washington, D.C.'s Robert F. Kennedy Memorial Stadium ("RFK Stadium") just prior to the beginning of televised Redskins football games. On both occasions the signs were removed, over Francis' and Stewart's protests, by Stadium management. Appellants subsequently sued in the District Court for the District of Columbia alleging that the D.C. Armory Board ("Board"), which operates RFK Stadium, had violated their first amendment rights and seeking damages, as well as declaratory and injunctive relief. Finding that RFK Stadium was not a public forum, the district court granted in large part appellees' motion to dismiss for failure to state a claim, Fed.R.Civ. P. 12(b)(6). We conclude that the question of whether RFK Stadium is a public forum is inherently a factual one and appellants have in their complaint alleged sufficient facts to withstand a motion to dismiss. It was error to dismiss appellants' claims at so early a stage of the litigation.

## I. BACKGROUND

### A. The Complaint

Accepting the allegations of the complaint as true, Fed.R.Civ.P. 12(b)(6), appellants' 3' × 15' paper banners reading "John 3:16" were hung in a safe manner on the railings behind both 20–yard lines prior to the beginning of the football games on January 8 and November 5. At no time did they pose a sightline problem or obstruct the vision of players or spectators.

On January 8, just before kick-off, one banner was removed by an unknown person acting with the knowledge and approval of the Armory Board. Appellant Francis intercepted a man attempting to remove the second sign; the man said he was doing so at the direction of his employer who was, as it turns out, CBS Sports.[2] Later during the game, Francis saw several armed guards and a man in plain clothes remove the sign. When Francis attempted to replace it he was threatened with arrest by a Stadium security guard and a District of Columbia police officer.

---

1. The reference is to the Bible verse: "For God so loved the world that He gave His only begotten Son that whosoever believeth in Him shall not perish, but have everlasting Life." Brief for Appellants at 4.

2. CBS Sports later apologized to appellants. Brief for Appellants at 4.

Hoping to resolve the issue informally, Francis contacted his United States Senator, Paul S. Trible, who in turn contacted the Armory Board. The Board's initial response, not alleged in the complaint, was that Francis' sign "was controversial in nature and for that reason had to be eliminated" in compliance with a policy prohibiting, *inter alia*, controversial signs. Joint Appendix ("J.A.") 32.[3] Alarmed by this response, the Senator again wrote to the Board seeking assurances that the Board's banner policy would be "modified to guarantee the First Amendment rights of Stadium patrons," and stating that such modification "would eliminate the very real possibility that the gentleman whose sign was removed would seek a judicial remedy for his grievance." J.A. 19. The Armory Board responded this time ("letter of August 17") by saying that after reviewing the policy, the Board was "pleased to advise that banners will now be allowed, except those that are obscene or provide free advertisement of products or services." J.A. 21.

With this letter ostensibly representing the Board's latest banner policy in hand, appellants again hung their signs out at the Redskins game on November 5. On this occasion, Francis and Stewart were approached by the Stadium General Manager who ordered them to remove the signs. The General Manager, when shown the letter, told them that "he nevertheless had to personally approve all signs as to whether they were 'obtrusive.'" J.A. 10. Despite his apparent agreement to honor the letter and permit the display of the signs "for tonight," *id.,* the signs were again removed prior to kick-off by uniformed Stadium security guards backed up by police officers.

Appellants alleged that on both occasions "there was a variety of First Amendment activity at the stadium." J.A. 11. They observed numerous signs and banners, "many as large or larger than plaintiffs' signs," J.A. 9; J.A. 11, displaying messages with a "diverse social, economic, philosophical, political, etc. content,"[4] *id.,* none of which was removed during the game. Additionally, at the November 5 game, political literature for the national general election on the following day was freely distributed.[5] Appellants alleged finally that the sequence of events on the two dates, almost a year apart, demonstrated that they would be prohibited from hanging their signs in RFK Stadium in the future. They sought relief in the form of nominal damages, a declaration of their right to hang their religious banners during football games and an injunction against further interference with those rights.

### B. *Disposition of the Complaint*

The Armory Board responded to appellants' complaint with a motion to dismiss for failure to state a claim under Fed.R. Civ.P. 12(b)(6).

The district court granted the motion in part and denied it in part. The court first found that RFK Stadium is a nonpublic forum on the basis of the authorizing statute, D.C.Code § 2-321, which states that the Stadium was to be built for holding athletic events; the court found the statute to be evidence that RFK Stadium is operated as a purely commercial venture and therefore that no public forum has been created.[6] As a consequence, the Armory Board was bound by the first amendment only to act reasonably and not discriminato-

---

3. This first policy statement ("letter of February 10") is discussed more fully, *infra,* at 1020–21.

4. Counsel for appellants indicated at oral argument that among these signs on November 5 was one that could presumably have been put in evidence reading "Redskins and Reagan Can't Lose."

5. Appellants indicate in their brief that they would have put in evidence handbills with the following message which were distributed at the

November 5 game by the D.C. Republican Committee: "REAGAN/BUSH '84 TOMORROW: MAKE A WAVE FOR REAGAN/BUSH. Every time a 'wave' starts during the game—HOLD YOUR SIGN UP! Let's show the nationwide TV audience that there is going to be a Reagan-Bush tidal wave tomorrow—and also, don't forget to vote." Brief for Appellants at 16.

6. *See* Part IC., *infra,* for a discussion of the public forum doctrine as it applies here.

rily in pursuing a policy on banners. The court then went on to determine that the Armory Board's policy was indeed reasonable; moreover, the court saw no need to resolve the precise dimensions of the policy because any policy that was not applied so as to discriminate against the viewpoints of particular speakers was reasonable.

Based on this reasoning, the district court dismissed all of appellants' claims except for a statutory civil rights claim and what the court termed appellants' "viewpoint discrimination claim." Although the complaint included no claim denominated as such, it appears that the surviving "viewpoint discrimination" claim would have allowed appellants to show that the Armory Board had removed their signs "solely to suppress the point of view [appellants] espouse[d] on an otherwise includible subject." *Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985). Such a showing would prove that the Armory Board had violated the first amendment as it applies to a nonpublic forum.

In order to make final the court's dismissal of the bulk of their claims, appellants subsequently voluntarily dismissed without prejudice the viewpoint discrimination claim and the statutory civil rights claim. This appeal was then taken.

## C. *The Public Forum Doctrine*

As the district court properly recognized, RFK Stadium is government-owned property [7] and appellants' first amendment claims must therefore be analyzed under the rubric of the public forum doctrine. We differ with the district court, however, as to what kinds of showing that doctrine requires to survive a motion to dismiss for failure to state a claim under the first amendment. Accordingly, we briefly review the public forum doctrine here.

In *Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985), the Supreme Court explained that it "has

adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." Restrictions on speech in a *public* forum must be necessary to achieve a compelling state interest and narrowly tailored to that end. *Id.* Restrictions on speech in a *nonpublic* forum, on the other hand, are subject to a much less stringent test: they must only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

██ The traditional public forum is a place that historically has been devoted to the free exchange of views; streets and parks are quintessential examples of traditional public fora. A public forum, however, is not created only by the sheer weight of tradition. A public forum may also be created by virtue of government designation. *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448. It is appellants' contention that RFK Stadium is a public forum by designation.

The touchstone for determining whether government property is a designated public forum is the government's intent in establishing and maintaining the property. *Id.* at 802, 105 S.Ct. at 3449. The fact that the Armory Board now argues that it does not intend to create a public forum is, of course, not dispositive. Intent is not merely a matter of stated purpose; rather, it is, as *Cornelius* pointed out, a matter to be inferred from a number of factors:

> [T]he Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's in-

---

**7.** The Armory Board is an independent government agency established by Congress and charged with the responsibility of constructing, maintaining and operating RFK Stadium. D.C. Code § 2–321.

tent.... We will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity.

473 U.S. at 802–03, 105 S.Ct. at 3448–49 (citations omitted). Reference to *objective* indicia of intent ensures that the designated public forum category will not, as some observers have feared, "shrink[ ] ... to such insignificance that it [would be] difficult to imagine how a plaintiff could ever successfully prosecute a lawsuit to gain access to such a forum." Post, "Between Government and Management: The History and Theory of the Public Forum", 34 UCLA L.Rev. 1713, 1757 (1987); *see also* 473 U.S. at 825, 105 S.Ct. at 3461 (Blackmun, J., dissenting). For the very fact that the government *has* restricted speech in the manner challenged in a forum case does *not* of its own weight demonstrate that the government did not intend to designate a public forum; the *Cornelius* factors require a court to look for the character of the forum in the nature of the property, its compatibility with expressive activity, and the *consistent* policy and practice of the government.

A number of forum cases emphasize the importance of these objective indicia of intent and the fact that consistent practice can on occasion overcome a bare statement of intent to the contrary. In *Perry, supra,* the Court stated that

[t]he use of the internal school mail by groups not affiliated with the schools *is no doubt a relevant consideration.* If by policy *or by practice* the Perry School District has opened its mail system for indiscriminate use by the general public, then [plaintiff] could justifiably argue a public forum has been created.

460 U.S. at 47, 103 S.Ct. at 956 (emphasis added). Rather than relying solely on the school district's assertions, the Court looked for indications *in the record* that "permission has been granted as a matter of course to all who seek to distribute material." *Id.* Finding no such indications, the Court held that the mail system

was not a public forum. Similarly, in *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), the Court looked to the factual record before rejecting public forum status for the Fort Dix military base. It found that there was a "considered Fort Dix policy, objectively and evenhandedly *applied,*" 424 U.S. at 839, 96 S.Ct. at 1218 (emphasis added), of preventing political campaigning on the base, that "no candidate of any political stripe had ever been permitted to campaign there," *id.,* and that there was a regular pattern of controlling access to the base, *id.* at 830, 90 S.Ct. at 1214. In *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the Court relied on "uncontradicted testimony at the trial that during the 26 years of public operation, the Shaker Heights system ... had not accepted or permitted *any* political or public issue advertising on its vehicles" in finding the advertising space on public buses to be a nonpublic forum. *Id.* at 300–01, 94 S.Ct. at 2715–16 (emphasis in original). And in *Hazelwood School District v. Kuhlmeier,* —— U.S. ——, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Court found a school newspaper published by a journalism class to be a nonpublic forum on the basis of the district court's *"factual* findings" about the degree to which the class instructor actually controlled the details of publication. 108 S.Ct. at 568–69 (emphasis added).

A court applying the tenets of these cases to a motion under Rule 12(b)(6) "may dismiss a complaint only if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations," *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (emphasis added); *accord Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Moreover, "a motion to dismiss for failure to state a claim upon which relief can be granted is generally viewed with disfavor and rarely granted." *Doe v. United States Department of Justice,* 753 F.2d 1092, 1102 (D.C.Cir.1985). And, where government action is challenged on first amendment grounds, a court should be especially

"unwilling to decide the legal questions posed by the parties without a more thoroughly developed record of proceedings in which the parties have an opportunity to prove those disputed factual assertions upon which they rely." *City of Los Angeles v. Preferred Communications*, 476 U.S. 488, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986).

■ We conclude that identifying the government's intent in this case raises inherently factual issues that cannot be resolved on a Rule 12(b)(6) motion. *Cf. Searcey v. Crim*, 815 F.2d 1389 (11th Cir.1987) (public forum question cannot be resolved on motion for summary judgment because question requires development of relevant facts); *May v. Evansville–Vanderburgh School Corp.*, 787 F.2d 1105, 1114–15 (7th Cir.1986) (opining that summary judgment not normally appropriate for resolution of public forum questions). As we discuss, *infra*, the plaintiffs below have alleged sufficient facts bearing on one or more of the objective indicia of intent to designate a public forum to survive dismissal for failure to state a claim.

## II. DISCUSSION

### A. *Dismissal of the Complaint*

■ A principal difficulty with the district court's dismissal of the complaint under Rule 12(b)(6) is that the court decided the public forum question on the merits in the absence of a factual record. As heretofore emphasized, the decision as to whether a forum is public usually invokes a factual inquiry. The forum doctrine itself is not a taxonomy of ideal types; it is virtually impossible in most cases to identify a public forum by legal inquiry alone, confined to the intrinsic nature of government actions or purposes. In particular, we do not find it possible to resolve the public forum issue in this case on the basis of the bare fact

that the property in question is a football stadium.[8] The only question before the district court on the motion to dismiss for failure to state a claim was whether it was plausible, based on the allegations made in the complaint, that appellants could prove that RFK Stadium is a public forum.

Instead of addressing this narrow question, the district court reasoned that RFK Stadium is a nonpublic forum on the basis of its status as a commercial football stadium designed, in the court's view, "to provide entertainment and make a profit, safely and efficiently." J.A. 48. Other references to relevant features of RFK Stadium operation on the dates in question were inferences drawn by the court from the single fact of its primary use for televised football games:

> Citizens were not gathered at RFK Stadium on January 8 and November 3 [sic], 1984, to hold civic meetings, debate issues or hear speeches. Attendance was limited to paying customers, and the purpose of the gatherings was to watch two football teams perform.... There can be but little question that the Redskins' football organization did not lease RFK Stadium on January 8 and November 5, 1984 to provide a forum for protected speech and debate by members of the public. To the contrary, the Redskins' management entered into that lease to generate commercial revenue and profit from paying customers and concessionaires.

J.A. 41–42. But these observations about the intent of Stadium patrons and players, even if true,[9] are not sufficient to defeat appellants' allegations about the intent of the government, *vis-a-vis* the creation of a public forum, for the purposes of a motion to dismiss under Rule 12(b)(6).

Appellants alleged facts clearly suggesting that the Armory Board has a practice—

8. In this connection we observe that stadiums may not have the same public forum status in all places at all times. The fact that other stadiums have been found to be nonpublic fora, while indicative, is not dispositive. *See International Society for Krishna Consciousness v. New Jersey Sports and Exposition Authority*, 691 F.2d 155 (3d Cir.1982).

9. In fact there was no evidence or allegation before the court concerning the purposes for which people had gathered at the Stadium; nor was there any evidence as to the purposes of the football organization in leasing the Stadium.

if not a policy—of allowing various types of first amendment activity to take place at RFK Stadium during games. For example, appellants claimed that large banners were displayed and political literature was distributed at the Stadium; such claims imply that the uses to which the Stadium is put during game-time are compatible with expressive activity. Appellants have also alleged that the Board indeed has a policy, represented in the letter of August 17 to Senator Trible, of allowing *all* banners except the obscene or commercial. We also take notice of the fact that the Stadium is a large open space, dedicated to boisterous recreational activity: it is not a place in which the efficient operation of quintessential government functions is so clearly at stake as in the federal workplace (*Cornelius*), on military bases (*Greer*), in public schools (*Perry, Hazelwood*), in the operation of public transportation (*Lehman*) or postal systems (*U.S. Postal Service v. Council of Greenburgh Civic Association*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981)).

Even if it is conceded that the government's primary purpose in operating the Stadium is to make a profit (as opposed to, say, build civic pride and community), that does not end the inquiry. It is possible that appellants could adduce enough evidence about the compatibility of the commercial purposes of the Stadium with expressive activity, a consistent pattern of such activity at the Stadium, and/or its ultimate reflection in the Armory Board's policies and practices, that a finding that the government did indeed through its practices and/or policies "intend" to create a public forum would be warranted. As we have explained, it is from such objective factual indicia that real intent is often inferred even when expressed intent runs counter. Appellants have clearly indicated enough in their complaint to suggest that such factual indicia may come to light after discovery and trial. We therefore conclude that the complaint was sufficient to survive the motion to dismiss.

## B. *Applying Public Forum Doctrine*

Having determined that the motion to dismiss should have been denied, we do not, of course, pass on the merits of the public forum question. *Cf. Preferred Communications, supra* (undesirable to express detailed views on first amendment questions on basis of complaint alone). That question is for the district court to resolve on the basis of a factual record. For issue-identification purposes only, we point out that on remand the district court may confront, *inter alia*, the following concerns.

■ The question which must be resolved in this litigation is what are the government's interests in operating a Stadium. For example, while spectators may attend to watch a football game, and players to play, the government's intent may be solely profitmaking. Alternatively, a government may build a stadium not as a money-making venture but rather to fill a need not satisfied by the private market. In such a case, the government may set out not to make a profit but simply to satisfy a public need. A government-operated university is an analogy. It is also conceivable that the government's intent is not commercial in either a profit or nonprofit sense: the government may intend to build civic pride, identity and cohesion through sponsorship of public events which bring citizens together for a common purpose. For these reasons, total reliance cannot be placed on the statute authorizing the Armory Board to build the Stadium as evidence of the government's intent. The statute says only that the Stadium is to be "suitable for holding athletic events." D.C.Code § 2–321; J.A. 42. By itself the statute cannot answer the central question of what the government's purposes *are* when it undertakes to sponsor athletic events.

■ Second, the compatibility of public property with expressive activity enters into the first amendment analysis in two different ways. In the first place, as discussed in *Cornelius, supra*, compatibility provides some evidence of the government's intent. Then, once the nature of the forum has been established, compatibil-

ity is relevant to the ultimate determination of whether restrictions on speech are either reasonable or narrowly tailored to a compelling state interest (the constitutional standards for nonpublic and public fora, respectively).

In examining compatibility, the district court appears to have conflated the first test into the second. Although the court noted that "the use of a stadium to present an athletic contest is not inconsistent with many types of expressive activity," J.A. 44, it apparently did not consider the alleged presence of banners and other expressive activity at the Stadium as evidence of compatibility bearing on the government's intent. Instead, the court took the government's "essentially commercial purpose," J.A. 45, as a given and proceeded to consider how this purpose could be disrupted by uncontrolled banners. J.A. 44–46. While this latter analysis might be appropriate in reviewing the constitutionality of the Armory Board's restrictions on speech once the government's intent has been determined, it is not the appropriate analysis for purposes of *identifying* that intent.

█ Finally, we reiterate that the consistent policy and practice of the Armory Board in controlling the uses of the Stadium are key indicators of the government's intent. In this respect any policy or practice of the Armory Board welcoming banners, perhaps evidenced by the alleged diversity of signs displayed around RFK Stadium during both football games, will enter directly into the threshold determination of whether a public forum has been created. In this case, the hospitality of the Stadium to banners may be particularly important because of conceded uncertainty about the Board's banner policies. The liberal policy statement alleged in the complaint was written after the January 8 event and the specter of litigation had been raised by Senator Trible. But we do not know as yet whether this statement accurately reflects the Board's policy, whether it has been published anywhere or the procedures by which such policies are promulgated. The very fact that appellants' signs were removed despite the representation in the letter that all banners except the obscene or commercial are welcome in the Stadium suggests that there is more to the "policy" than meets the naked eye. Moreover, the complaint alleges that the General Manager told appellants on November 5 that whatever the letter said, his approval was required for all signs (approval which he ultimately withheld). Thus, at this early stage it is still unclear whether this one-on-one approval is part of the "policy,"[10] whether the Board has adopted any standards on which to base this discretionary approval, or whether there is in fact any practice of generally supervising signs. These matters should be resolved on remand. What has been and may during trial be represented as "policy" cannot be simply *ex post* justification for the Armory Board's decision selectively to exclude appellants' signs.

The dimensions of the Board's policy are further complicated by the fact that the district court had before it yet another policy statement in the February 10 letter also written to Senator Trible in connection with the events of January 8.[11] The Armory Board referred to this earlier policy in its motion to dismiss as "prohibit[ing] signs and banners unrelated to the event scheduled at the Stadium." J.A. 26. The letter itself represented the earlier policy as follows:

Banners are generally permitted inside the Stadium unless they offer a message which is obscene, political, religious, controversial in nature, appear [sic] to advertise or otherwise does not relate to the event being held. Likewise, any banner which when installed creates a sight-

J.A. 26–27. We note that the latter restriction does not appear in the letter to Senator Trible.

10. The Armory Board's motion to dismiss represented the policy as "permit[ting] persons to display signs provided they are not obscene, do not provide free advertisement of products or services and do not interfere with anyone's view of the event or any previously posted signs."

11. This letter was not alleged in the complaint, but rather was attached to appellants' brief to the district court in response to appellees' reference to the policy in the motion to dismiss.

line problem or is suspended by objects which could be physically dangerous to patrons are [sic] not permitted inside the facility. . . . [I]t was the opinion of the Stadium Management that the John 3:16 message was controversial in nature and for· that reason had to be eliminated. That opinion was supported by a reported two dozen or so phone calls to the CBS studios in New York, objecting to the message.

J.A. 31–32. Resolving the dimensions of the policy, as a general matter and not merely as applied to these appellants, is crucial to the threshold question of whether or not RFK Stadium is a public forum.[12] Mere statements of policy, if consistently contradicted by practice, are not dispositive. The core question here—a factual one—is precisely what policies the Board follows in controlling the use of the Stadium for expressive activity.

### III. CONCLUSION

We find that appellants' complaint succeeds in stating a claim on which relief can be granted and that consequently the motion to dismiss under Fed.R.Civ.P. 12(b)(6) should have been denied. The public forum doctrine as explained by the Supreme Court indicates that the inquiry into the nature of a forum raises factual issues about policy and practices in ascertaining the government's intent. Appellants' allegations about the presence of other banners and first amendment activity in RFK Stadium during the football games on January 8 and November 5, 1984, and the alleged welcoming policy of the Armory Board as to all banners except the obscene or commercial, if proved, would be some evidence of the government's intent in operating RFK Stadium to create a public forum of some dimension. The judgment of the district court dismissing appellants' complaint is reversed and the case remanded for further proceedings consistent with this opinion.

---

**12.** The dimensions of the "policy" are also relevant, of course, to the substance of appellants' claim that the Armory Board's restrictions on speech are unconstitutional.