**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

POCATELLO EDUCATION
ASSOCIATION; IDAHO EDUCATION
ASSOCIATION; PROFESSIONAL FIRE
FIGHTERS OF IDAHO, INC.; SERVICE
EMPLOYEES INTERNATIONAL UNION,
LOCAL 687; AFL-CIO,
                    *Plaintiffs-Appellees,*

                    v.

MARK HEIDEMAN, in his official
capacity as Bannock County
Prosecuting Attorney,
                    *Defendant,*

                    and

BEN YSURSA, in his official
capacity as Secretary of State for
the State of Idaho; LAWRENCE
WASDEN, in his official capacity as
Attorney General for the State of
Idaho,
                    *Defendants-Appellants.*

No. 06-35004

D.C. No.
CV 03-0256 BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted
August 9, 2007—Seattle, Washington

Filed October 5, 2007

Before: William C. Canby, Jr., A. Wallace Tashima, and
Consuelo M. Callahan, Circuit Judges.

13527

Opinion by Judge Tashima

## COUNSEL

Clay R. Smith, Idaho Deputy Attorney General, Boise, Idaho, for the defendants-appellants.

Jeremiah A. Collins, Bredhoff & Kaiser, Washington, D.C., for the plaintiffs-appellees.

**OPINION**

TASHIMA, Circuit Judge:

Plaintiff labor organizations ("Plaintiffs") sued officials of the State of Idaho, claiming that the Voluntary Contributions Act ("VCA"), Idaho Code §§ 44-2004(2) and -2601 to -2605, violated Plaintiffs' constitutional rights under the First Amendment as well as other constitutional provisions. Before the district court, the State officials conceded that all challenged provisions were unconstitutional, except Idaho Code § 44-2004(2), which prohibits any payroll deductions for "political activities." The district court held the ban on payroll deductions to be constitutional as applied to the state government itself, but unconstitutional as applied to private and local government employers. The State officials contend on appeal that the payroll deduction ban may be constitutionally applied to local government employers. We have jurisdiction pursuant to 28 U.S.C. § 1291.

We hold that Idaho Code § 44-2004(2), as applied to local government employers, violates the First Amendment because it is a content-based law for which the State officials assert no compelling justification. Moreover, the State officials have not demonstrated that the law should be reviewed under the more relaxed standard applicable to speech restrictions in nonpublic fora. In particular, they have not shown that the State of Idaho may properly assert a proprietary interest in controlling access to the payroll systems that constitute the fora in this case. Caselaw suggests that the authority over local governments the State possesses by operation of law is not enough to associate the local workplaces or payroll deduction programs with the State of Idaho, and the State officials

have adduced no specific evidence that the State actually does own, administer, or control the payroll deduction programs.

## STANDARD OF REVIEW

We review de novo the district court's decision on cross-motions for summary judgment, *Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002), applying the same standard used by the trial court under Federal Rule of Civil Procedure 56(c), *Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003). We must decide whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001). Mixed questions of law and fact and ultimate conclusions of law receive de novo review. *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 567 (1995); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984). We may affirm the district court's grant of summary judgment on any ground supported by the record. *Enlow v. Salem-Keizer Yellow Cab Co.*, 371 F.3d 645, 649 (9th Cir. 2004).

## FACTUAL AND PROCEDURAL BACKGROUND

In 2003, the Idaho legislature enacted the VCA, a series of amendments to Title 44 of the Idaho Code, including an amendment to Chapter 20 ("Right to Work"). *See* 2003 Idaho Sess. Laws Ch. 97, 340 (enacting H.B. 329 and S.B. 1176); *id.* Ch. 340 (S.B. 1176). The Chapter 20 amendment states: "Deductions for political activities as defined in chapter 26, title 44, Idaho Code, shall not be deducted from the wages, earnings or compensation of an employee." Idaho Code § 44-2004(2).[1] "Political activities" are defined as "electoral activi-

---

[1]The VCA also amended Idaho Code § 67-6605, allowing political committees to "solicit or obtain contributions from individuals as provided

ties, independent expenditures, or expenditures made to any candidate, political party, political action committee or political issues committee or in support of or against any ballot measure." Idaho Code § 44-2602(1)(e).

Plaintiffs filed suit challenging the constitutionality of the VCA, naming as defendants Bannock County Prosecuting Attorney Mark Heideman, Idaho Attorney General Lawrence Wasden, and Secretary of State Ben Ysursa (collectively, "Defendants"). Plaintiffs sought declaratory and injunctive relief from enforcement of § 44-2004(2) as violative of their rights to free speech and equal protection under the First and Fourteenth Amendments.[2]

Defendants conceded that several provisions of the VCA were unconstitutional because they restricted the ability of labor organizations to solicit political contributions, namely, Idaho Code §§ 44-2601 to -2605. On cross-motions for summary judgment with respect to the remaining substantive provision banning payroll deductions for political activities, the district court held that the payroll deduction prohibition violated the First Amendment to the extent it applied to local government employers and private employers. It also held, however, that the payroll deduction ban could be applied con-

---

in chapter 26, title 44, Idaho Code, or as provided in section 44-2004, Idaho Code."

Finally, the VCA added the following subsection to Idaho Code § 44-2004:

> (3) Nothing in this chapter shall prohibit an employee from personally paying contributions for political activities as defined in chapter 26, title 44, Idaho Code, to a labor organization unless such payment is prohibited by law.

*See* 2003 Idaho Sess. Laws ch. 97 (enacting H.B. 329).

[2]The district court denied Eleventh Amendment immunity to Wasden and Ysursa and that denial was affirmed on appeal. *Pocatello Educ. Ass'n v. Heideman*, 123 F. App'x 765 (9th Cir. 2005).

stitutionally to the State's own payroll system, *i.e.,* to employees of the State of Idaho. Accordingly, the court granted in part and denied in part both motions. *Pocatello Educ. Ass'n v. Heideman*, 2005 WL 3241745 (D. Idaho 2005). Ysursa and Wasden ("Appellants") now appeal the district court's ruling that § 44-2004(2) is unconstitutional with respect to local government employers and school district employers.[3]

## ANALYSIS

Idaho Code § 44-2004(2) burdens speech by diminishing Plaintiffs' ability to conduct any of the activities defined by the Idaho Code as "political." The term "political activities" is broadly defined to include virtually all types of electioneering, including "electoral activities" as well as spending on behalf of or against candidates, ballot measures, political action or issue committees, or parties. *See* Idaho Code § 44-2602(1)(e).

The First Amendment provides that "Congress shall make

---

[3]School districts are but one category of local governmental entities in Idaho. The Idaho Constitution specifically recognizes cities and counties. Idaho Const. art. XII, § 1 (providing for incorporation of cities and towns), Code § 50-201; Idaho Const. art. XVIII, §§ 1-12 (county organization); *see also* Idaho Code § 50-201. In addition, the state legislature has created "[a] wide variety of special districts," including school districts. *See* Michael C. Moore, *The Idaho Constitution & Local Governments — Selected Topics*, 31 Idaho L. Rev. 417, 422 & n.29 (1995) (discussing the creation by statute of local government units such as regional airport authorities, cemetery maintenance districts, fire protection districts, ambulance districts, regional solid waste disposal districts, recreation districts, school districts, library districts, hospital districts, mosquito abatement districts, highway districts, water and sewer districts, irrigation districts, and auditorium districts). Although Appellants' briefs and the district court's order sometimes refer to school districts as distinct from local government, the First Amendment analysis undertaken here applies to all local governmental entities. Therefore, except where relevant under Idaho law, we do not separate or separately discuss school district employers from other local government employers.

no law . . . abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances." The Fourteenth Amendment renders that prohibition applicable to the States. *See, e.g.*, *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940) (explaining that freedom of speech is one of the fundamental personal rights and liberties secured against state abridgment by the Fourteenth Amendment).

This restriction on voluntary political contributions burdens political speech, which is protected by the First Amendment; indeed, political speech is a "central concern" of First Amendment jurisprudence. *See Burson v. Freeman*, 504 U.S. 191, 196 (1992) (plurality opinion); *accord*, *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 127 S. Ct. 2652, 2664 (2007); *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 657 (1990); *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1008 (9th Cir. 2003). "[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966).

The law does not prohibit Plaintiffs from participating in political activities, but it hampers their ability to do so by making the collection of funds for that purpose more difficult. The district court found that unions face substantial difficulties in collecting funds for political speech without using payroll deductions because of their members' concerns over identity theft associated with other electronic transactions, as well as the time-consuming nature of face-to-face solicitation. The district court found that the payroll deduction ban would decrease the revenues available to Plaintiffs to use for political speech. Restricted funding will, therefore, diminish Plaintiffs' ability to engage in political speech, and § 44-2004(2) is properly viewed as a regulation of protected speech. *Cf. Meyer v. Grant*, 486 U.S. 414, 420-23 (1988) (holding that a Colorado law prohibiting the payment of circulators of initiative petitions is properly viewed as a burden on political

speech because its effect was to limit the number of voices who would convey a petition's message, limit the size of the audience who would receive the message, and make it less likely the petition would gain enough signatures to earn placement on the state ballot).

The law on its face prohibits payroll deductions only for political activities. This is subject-matter discrimination, which is a form of content discrimination. *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 537-38 (1980); *see also Burson*, 504 U.S. at 197 (holding a Tennessee law prohibiting speech related to a political campaign near polling places to be a content-based restriction); *Bayless*, 320 F.3d at 1009 (holding a state statute restricting only expenditures which expressly advocate election or defeat of a candidate to be a content-based restriction).

Ordinarily, because we are dealing with content-based restriction of political speech, we would evaluate its validity under strict scrutiny. *Fed. Election Comm'n*, 127 S. Ct. at 2664. Indeed, content-based regulations of speech are generally presumptively invalid, under the rationale "that content discrimination 'raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.' " *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)). To be constitutional, § 44-2004(2) must be narrowly tailored to serve a compelling interest. *Fed. Election Comm'n*, 127 S. Ct. at 2664. As Appellants proffer no compelling interest in favor of the law, both sides agree that it would easily fail strict scrutiny.[4]

Strict scrutiny, however, is not applied in all circumstances

---

[4]The parties appear to agree that this is the proper outcome with respect to the payroll deductions of private employers, as Appellants do not challenge on appeal the district court's holding that § 44-2004(2) is unconstitutional with respect to this group.

involving content-based restrictions. *See Davenport v. Wash. Educ. Ass'n*, 127 S. Ct. 2372, 2381 (2007). Appellants contend that two excepted circumstances apply here, and it is to that argument that we now turn.

## I.   Government-Subsidized Speech

**[1]** In general, government may refrain from paying for speech with which it disagrees. *See, e.g.*, *Regan v. Taxation With Representation*, 461 U.S. 540, 544-46 (1983) (explaining that Congress may make content-based distinctions when it subsidizes speech, in that case by granting to qualifying organizations the amount of income taxes they would otherwise owe); *Chamber of Commerce v. Lockyer*, 463 F.3d 1076, 1080, 1096-97 (9th Cir. 2006) (en banc) (California law prohibiting the use of state grant and program funds on activities related to union organizing did not infringe affected employers' First Amendment rights). The nonsubsidy doctrine is premised on the rationale that the government is free to confer no benefit at all and is therefore entitled to condition the receipt of the benefit on speech or silence. *See Regan*, 461 U.S. at 549-50; *but cf. Legal Aid Soc'y v. Legal Servs. Corp.*, 145 F.3d 1017, 1024-29 (9th Cir. 1998) (discussing unconstitutional restrictions upon which the government may not condition receipt of a benefit).

**[2]** Applying this doctrine, the district court held that the State of Idaho could properly forbid payroll deductions of its own employees to be used for union activities, as the First Amendment imposes no obligation to subsidize union and employee speech by paying for the administration of the payroll deductions. *Pocatello Educ. Ass'n*, 2005 WL 3241745, at *2; *cf. Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 319-20 (6th Cir. 1998); *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1257 (4th Cir. 1989). The parties appear to be in agreement as to this point, and the holding is unchallenged on appeal. As the district court noted, however, there is no sub-

sidy by the State of Idaho for the payroll deduction systems of local governments.

## II.   Forum Analysis

In certain cases, regulation of speech on government property is not subject to strict scrutiny. In particular, it is well established "that, when the government permits speech on government property that is a nonpublic forum, it can exclude speakers on the basis of their subject matter, so long as the distinctions drawn are viewpoint neutral and reasonable in light of the purpose served by the forum." *Davenport*, 127 S. Ct. at 2381; *see also Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682-83 (1998) (approving exclusion of independent political candidate from public television debate because he had little popular support). Appellants invoke this doctrine, arguing that the proper way to view the statute is to look at the payroll deduction programs of local governments as nonpublic fora belonging to the State.[5] Appellants argue that § 44-2004(2) is therefore valid because it is viewpoint neutral, applying to all employers and to any type of political contribution, and assert that the restriction "is plainly reasonable given Idaho's interest in its payroll system not assisting or having the appearance of assisting with political matters."

### A.

[3] Government regulation of speech in public spaces has historically been governed by the public forum doctrine. *See United States v. Kokinda*, 497 U.S. 720, 725-27 (1990)

---

[5]Appellants assert their First Amendment forum-analysis argument for the first time on appeal. We usually consider such arguments to be waived. *See Janes v. Wal-Mart Stores, Inc.*, 279 F.3d 883, 888 n.4 (9th Cir. 2002); *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978). It is within our discretion, however, to consider pure questions of law raised for the first time on appeal. *See Janes*, 279 F.3d at 888 n.4; *Patrin*, 575 F.2d at 712. Because Appellants present their forum-analysis argument as a pure question of law, we exercise our discretion to address it.

(explaining development of doctrine); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983) (formally classifying public property into three groups). The extent to which the government can control access depends on the nature of the relevant forum. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985). The traditional public forum includes property characterized, "by long tradition or by government fiat" as "devoted to assembly and debate." *Perry Educ. Ass'n*, 460 U.S. at 45 (noting that streets and parks are the quintessential examples of public fora). The government may exclude speakers from a traditional public forum "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800; *see also Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515-16 (1939) (Opinion of Roberts, J.) ("The privilege . . . to use the streets and parks for communication of views on national questions may be regulated in the interest of all; . . . but it must not, in the guise of regulation, be abridged or denied.").

In comparison, "designated public fora" are created where the government has opened public property for expressive activity. *Perry Educ. Ass'n*, 460 U.S. at 45. If the government has opened the property to a class of speakers, rather than offering selective access to individual speakers, the property is a designated public forum with respect to all speakers within that class. *Ark. Educ. Television Comm'n*, 523 U.S. at 678; *Flint v. Dennison*, 488 F.3d 816, 831 (9th Cir. 2007); *Widmar v. Vincent*, 454 U.S. 263, 267 (1981) (state university created designated public forum for registered student groups by implementing policy that expressly made its meeting facilities "generally open" to such groups). The state may also designate a public forum for discussion of certain subjects. *Perry Educ. Ass'n*, 460 U.S. at 46 n.7, *citing City of Madison Joint Sch. Dist. v. Wis. Pub. Employment Relations Comm'n*, 429 U.S. 167 (1976). In a designated public forum, content-based prohibitions on speech, including the exclusion of particular speakers, "must be narrowly drawn to effectuate a

compelling state interest." *Perry Educ. Ass'n*, 460 U.S. at 46; *see Ark. Educ. Television Comm'n*, 523 U.S. at 678; *Cornelius*, 473 U.S. at 802.[6] In other words, as long as the forum is open, the state is bound by the same standards as apply to the traditional public forum. *Perry Educ. Ass'n*, 460 U.S. at 46.

Finally, a nonpublic forum has been characterized as "[a]ny public property that is not by tradition or designation a forum for public communication." *Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 907 (9th Cir. 2007). For example, in *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) ("*ISKCON*"), the Court declared airport terminals to be a nonpublic forum because, although speech activity occurs in airport terminals, their tradition and purpose is to facilitate passenger air travel and serve as a commercial enterprise, not to promote expression. *Id.* at 679, 682-83. The government may limit access to "a nonpublic forum to activities compatible with the intended purpose of the property." *Perry Educ. Ass'n*, 460 U.S. at 49.[7]

---

[6]On occasion, this circuit has referred to the "limited public forum" as a subcategory of the designated public forum. *See Flint*, 488 F.3d at 830-31; *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001). Other decisions treat the terms interchangeably. *See, e.g.*, *Currier v. Potter*, 379 F.3d 716, 728 n.8 (9th Cir. 2004) (citing, *inter alia*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

[7]Government property need not be any type of forum at all. For example, the Supreme Court has held that, as a general rule, most public television shows are not fora because broadcasters must retain considerable programming discretion in order to fulfill their mandate of airing programming that serves the public interest. *Ark. Educ. Television Comm'n*, 523 U.S. at 673-75. In those instances, the First Amendment does not guarantee any right of access. *See United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (noting that forum analysis is "incompatible" with consideration of internet access in public libraries because library staff must consider content in making decisions regarding the library collection, including the library's internet); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586 (1998) (declining to apply forum analysis because it would conflict with the content-based nature of funding consideration).

**[4]** A "forum" does not need to be a physical place. *See Rosenberger*, 515 U.S. at 830 (endorsing use of forum analysis in considering fora defined "more in a metaphysical than in a spatial or geographic sense"). For example, in *Cornelius*, the Supreme Court held that a charity drive within federal workplaces constituted a forum. 473 U.S. at 801. The Court reasoned that the relevant forum should be determined on the basis of the type of access sought by the speaker to the relevant property, and the NAACP did not claim any general right of access to the federal workplace outside of the charity drive. *Id.* at 801-02. Thus, the Court considered the relevant forum to be the charity drive itself rather than the federal workplace. *Id.*; *see also Rosenberger*, 515 U.S. at 830 (forum is the university's student fund responsible for monetary reimbursements to student groups); *Perry Educ. Ass'n*, 460 U.S. at 46 (forum is the public school mail facilities and delivery system); *Flint*, 488 F.3d at 831 (forum is a student government election); *Child Evangelism Fellowship v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1069 (4th Cir. 2006) (forum is the school's policy of waiving fees for the after-hours use of school facilities).

**[5]** Following *Cornelius*, the relevant forum in this case would be the payroll deduction programs of the local governments, as Plaintiffs seek access to this part of local government workplaces. Appellants assert that the payroll deduction programs are nonpublic fora. The government may place content-based limits on speech in a nonpublic forum, *Perry Educ. Ass'n*, 460 U.S. at 49, "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806. Appellants assert that § 44-2004(2) meets this test.[8]

Nevertheless, Plaintiffs argue strenuously that forum analy-

---

[8]In *Cornelius*, a restriction similar to that at issue here passed muster as a reasonable content-based restriction of speech in the context of a nonpublic forum. 473 U.S. at 811.

sis does not apply at all because neither the payroll deduction programs nor the local workplaces are "property" of the State of Idaho in any sense, and the State of Idaho therefore cannot assert an interest in protecting the fora. To resolve this question, we consider first the required relationship between the government entity seeking to impose a free speech restriction and the forum in which it is imposed. We then examine the relationship between the State of Idaho and the workplaces of its local governments.

**B.**

[6] In *ISKCON*, the Court explained the rationale for forum analysis as follows: "Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject." 505 U.S. at 678. Thus, in these situations, the role of the government has changed from regulator to something akin to that of a private landowner, with at least some of the associated exclusionary rights.[9] *See Greer v. Spock*, 424 U.S. 828, 836 (1976) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."); *Davis v. Massachusetts*, 167 U.S. 43, 47 (1897) (analogizing the government's control over public property to that of "the owner of a private house").

Forum analysis developed in battles over access to physical spaces, such as streets, buses, and airports, where property law provides a ready guide to the scope of the government's rights. Supreme Court precedent accordingly suggests that a

---

[9]Of course, if the government opens property it owns to the general public for expression, its regulations of content are subject to strict scrutiny. *Cornelius*, 473 U.S. at 800. Thus, proprietorship alone is not enough to exclude selectively; the proprietor must confine its property to narrow uses.

forum may be subject to government control where the government entity maintains a proprietary relationship over the relevant property. For example, in *ISKCON*, the Court noted specifically that the Port Authority of New York and New Jersey, the entity which had adopted the speech-restricting regulation, owned and operated the airport terminals which constituted the property subject to the challenged regulation. 505 U.S. at 675; *see also Ark. Educ. Television Comm'n*, 523 U.S. at 669, 678 (state agency owned and operated the television station which held the political debate determined to be a nonpublic forum); *Kokinda*, 497 U.S. at 723, 725 (federal government acted in a proprietary capacity in restricting access to postal service sidewalk owned by postal service); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304 (1974) (content-based limits placed by city on access to municipal transit system's advertising space held to be "reasonable legislative objectives advanced by the city in a proprietary capacity").[10]

By contrast, the mere possession of legal authority to regulate an entity, without more, represents an insufficient level of control over that property to claim the forum in the name of the State. In *Consolidated Edison*, the Supreme Court rejected an attempt by the State of New York, acting through the New York Public Service Commission, to regulate Consolidated

___

[10]As noted above, where a plaintiff seeks only selective access to the property, such as a particular program administered on the property, then the forum is the program rather than the property. *See, e.g.*, *Cornelius*, 473 U.S. at 801. Nevertheless, in such cases, courts have continued to focus on the proprietor of the property itself, evaluating the right of that party to control access to the forum at issue. *See, e.g.*, *Currier*, 379 F.3d at 729 (examining whether Postal Service "open[ed] up its property for use as a public forum" even though the relevant forum was only the provision of general delivery service); *cf. Cornelius*, 473 U.S. at 801-02 (noting that the Court would not ignore the nature of the federal workplace itself even though the forum was merely a type of access to that property). Here, although the workplaces of the local governments constitute the larger properties, the relevant fora are the payroll deduction programs to which Plaintiffs seek access.

Edison's monthly bill inserts. 447 U.S. at 532-33. The State argued that it was entitled to treat the billing envelope as "subject to the State's plenary control" because of the State's regulatory interest in controlling operations of a public utility. *Id.* at 540; *see also id.* at 534 n.1 (noting that Consolidated Edison, although privately owned, was a government-regulated monopoly). The Court held that the State's legitimate regulatory interest in controlling Consolidated Edison's activities did not alter the nature of the property as private; therefore, caselaw governing rights of access to governmental property did not apply. *Id.* at 539-40 & n.8.

## C.

Reviewing the relationship between the State of Idaho and the workplaces of local governments, we conclude that Appellants have failed to establish that the State of Idaho is the proprietor of the local workplaces or of local government payroll systems. The State's relationship with the local governments instead resembles that of a regulator who possesses broad powers over them.

Appellants' evidence of control over local governments is similar to that presented by the State of New York in *Consolidated Edison*. Appellants rely exclusively on the state legislature's authority over Idaho's political subdivisions, arguing that the state's power to regulate various aspects of local government necessarily gives it the right to control access to the local governments' payroll deduction programs. They point out that the legislature may create, control, alter and abolish local governments as it sees fit, subject only to the limits of the Idaho Constitution, citing *State ex rel. Hays v. Steunenberg*, 45 P. 462, 463 (Idaho 1896). Appellants discuss the doctrine of preemption of municipal law by State law, note that local governments may levy taxes only to the extent they are authorized to do so by the legislature, and note the limits on the borrowing capabilities of counties, cities, and school districts, citing Idaho Const. art. XII, § 6; *id.* art. XIII, § 4;

*Brewster v. City of Pocatello*, 768 P.2d 765, 766 (Idaho 1988); *Caesar v. State*, 610 P.2d 517 (Idaho 1980); *Idaho Water Res. Bd. v. Kramer*, 548 P.2d 35 (Idaho 1976); *State v. Robbins*, 81 P.2d 1078, 1080 (Idaho 1938)).

Appellants note that school districts are supervised and controlled by the State Board of Education, Idaho Code § 33-116, which must approve the changing of school district boundaries, the addition or subtraction of territory, and the creation of new districts. *Id.* §§ 33-307, 33-308, 33-312. Appellants also highlight *Common School District No. 61 v. Twin Falls Bank & Trust Co.*, 4 P.2d 342 (Idaho 1931), which states that school districts are agencies of the state. *Id.* at 343; *but see Smith v. Meridian Joint Sch. Dist. No. 2*, 918 P.2d 583, 591 (Idaho 1996) (calling this holding into doubt in light of the subsequent passage of the Idaho Administrative Procedures Act, which specifically defines the term "agency"). Finally, school districts can only exercise implied powers consistent with those expressly granted by the legislature. *Olmstead v. Carter*, 200 P. 134, 135-36 (Idaho 1921).

**[7]** As illustrated by *Consolidated Edison*, however, the generalized lawmaking power held by the legislature with respect to a state's political subdivisions does not establish that the state is acting as a proprietor with respect to the property of local governments. In *Consolidated Edison*, the New York legislature had granted the Public Service Commission broad regulatory powers over Consolidated Edison. *See Consol. Edison Co. v. Pub. Serv. Comm'n*, 47 N.Y.2d 94, 102 (1979) (noting that the Public Service Commission was granted " 'all powers necessary or proper to enable it to carry out the purposes of' the Public Service Law") (quoting N.Y. Pub. Serv. Law § 4(1)), *rev'd*, 447 U.S. 530 (1980). The Court nevertheless found this broad grant of authority insufficient to render Consolidated Edison's billing envelopes a forum of the Public Service Commission. Here, nothing in the Idaho Code suggests that Idaho is the proprietor of the local government workplaces or their payroll deduction programs.

The statutes instead suggest the opposite — that the State has granted units of local government the right to own and control their own property, independent of the State's control.

Many units of local government in Idaho are expressly declared to be independent corporate bodies, suggesting independent powers of management and governance as compared with state agencies, which lack a similarly corporate status. *See, e.g.*, Idaho Code §§ 27-115 (cemetery maintenance districts), 31-601 (counties), 31-4204 (housing authorities), 31-4317 (recreation districts), 31-4903 (waste disposal districts), 33-301 (school districts), 33-2714 (library districts), 40-1301 (highway districts), 50-301 (cities); *cf. id.* §§ 20-201 (declaring State Board of Corrections to be an agency of the State), 33-101 (State Board of Education belongs to the executive department of state government), 36-101 (classifying Department of Fish and Game as a branch of the executive department of state government).

Caselaw has also recognized that local governments are distinct entities from the State of Idaho. *Cf. Idaho Sch. for Equal Educ. Opportunity v. State*, 97 P.3d 453, 457-58 (Idaho 2004) (affirming school districts' right to sue the State despite a statute purporting to limit this right); *Smith*, 918 P.2d at 590-91 (holding that school districts and their boards of trustees are separate entities from the state); *Union Pac. R.R. v. Idaho*, 654 F. Supp. 1236, 1241 (D. Idaho 1987) (denying Eleventh Amendment immunity to county officials and holding that counties are independent political subdivisions of the state).[11]

---

[11]We note that the line of reasoning Appellants assert in this case has also been considered and rejected with respect to the question of local governments' entitlement to Eleventh Amendment immunity. Various local governments, arguing that they are creatures of their respective states, have attempted to assert immunity from suit, but it is well-established that local governments are not considered arms of the state for such purposes. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280-81 (1977); *Workman v. City of New York*, 179 U.S. 552, 563-66 (1900); *Lincoln County v. Luning*, 133 U.S. 529 (1890); *see also Regents of the Univ. v. Doe*, 519 U.S. 425, 429-31 (1997).

Of particular importance to forum analysis, the legislature has granted many local governmental units various powers to acquire, hold, and convey real and personal property. *See, e.g.*, Idaho Code §§ 27-118 (cemetery maintenance districts), 31-604 (counties), 31-1419 (fire protection districts), 31-4114 (television translator districts), 31-4204 (housing authorities), 31-4317 (recreation districts), 33-301 (school districts), 50-301 (cities). These rights of ownership are clearly independent of the State itself, as other portions of the Code discuss the ability of the local government units to grant property to the State or to other political subdivisions of the State. *See, e.g.*, Idaho Code §§ 31-1420(7). For example, school districts have the same property transfer rights vis-à-vis the State as they have vis-à-vis other government entities. *Id.* § 33-601(4)(b). Appellants presented no evidence that local workplaces are treated differently than other types of property owned by local government.

[8] In sum, the State's broad powers of control over local government entities are solely those of a regulator, analogous to the New York Public Service Commission's regulatory powers over Consolidated Edison. Local governments are independent corporations and many are explicitly granted the right to own and control their own property. Lacking any evidence of the State's proprietary relationship with the local government workplace, Appellants' assertion that the payroll deduction programs of local governments are nonpublic fora belonging to the State must fail.

## D.

When pressed at oral argument, Appellants conceded that the State of Idaho is not the proprietor of local government workplaces or their payroll deduction programs. Nevertheless, Appellants suggest that *Consolidated Edison*, involving use of private property, is fundamentally different from the situation presented here, and that Plaintiffs' focus on property ownership and control is inapposite. They emphasize that, unlike

private corporations such as Consolidated Edison, local governments are exclusively creatures of the State's creation; therefore, the instrumentalities of local governments are necessarily the instrumentalities of the State of Idaho, regardless of who "owns" them.

We do recognize that the forum doctrine's stated roots in property rights has been subject to some criticism. *See, e.g.*, *Kokinda*, 497 U.S. at 747 n.4 (Brennan, J., dissenting); Timothy Zick, *Speech and Spatial Tactics*, 84 Tex. L. Rev. 581 (2006) (arguing that First Amendment rights should depend on the "place" of speech rather than the form of property); Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum*, 34 UCLA L. Rev. 1713, 1777 (1987) ("The Court's present focus 'on the character of the property at issue' is a theoretical dead end, because there is no satisfactory theory connecting the classification of government property with the exercise of first amendment rights.") (quoting *Perry Educ. Ass'n*, 460 U.S. at 44). There is some support in the caselaw for an alternative theory of forum analysis which evaluates the forum in light of the degree of control exercised by the government entity. Under this approach, the question is not one of ownership or proprietorship but whether the government has exercised a sufficient degree of control over the forum such that it should be granted the right to make speech-restrictive rules in the forum.

In *United States Postal Service v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114 (1981), for example, the Court applied forum analysis to privately-owned mailboxes. *Id.* at 123, 128. Clearly, no proprietary relationship exists between the government and private mailboxes. Nevertheless, the Court compared the government's rights with respect to the mailboxes to those of a private owner and declared that the State had the ability to preserve "property under its control." *Id.* at 130. Cited laws controlling the use of mailboxes included a federal regulation designating the boxes as "autho-

rized depositor[ies]" of mail and federal criminal laws affording such boxes protection against damage and the destruction of the mail contained therein. *Id.* at 123. Indeed, the boxes only became "mailboxes" because of the government's daily use of the boxes for that purpose; in that sense, their essential character was completely controlled by the government. *See also Perry*, 460 U.S. at 46 (citing *Greenburgh*, 453 U.S. at 129, for the proposition that property owned *or controlled* by the government calls for forum analysis); *United Church of Christ v. Gateway Econ. Div. Corp. of Greater Cleveland, Inc.*, 383 F.3d 449, 454 (6th Cir. 2002) (recognizing that whether a privately-owned sports Complex could be treated as public property for purposes of forum analysis "turned on the amount of control exercised over . . . the Complex by the state"); *Perez v. Hoblock*, 368 F.3d 166, 169 n.2, 173 (2d Cir. 2004) (finding a private office in a privately-owned racetrack to be a nonpublic forum where New York regulations extensively controlled the sport of horse racing as well as the track's owner); *Texas v. Knights of the Ku Klux Klan*, 58 F.3d 1075, 1078-79 (5th Cir. 1995) (defining the adopt-a-highway program as a nonpublic forum of the State of Texas, citing the State's detailed management of the program's administration).

Under such circumstances, one can argue that the state has a sufficient managerial interest in the resource to justify judicial deference to its rules. *See* Post, *supra*, 34 UCLA L. Rev. at 1775 (suggesting that the state is subject to greater First Amendment restraints when it acts to govern the general public than when it acts in a "managerial" capacity toward its own institutions); *see, e.g.*, *Cornelius*, 473 U.S. at 805 (running of charity drive involves the government's "discretion and control over the management of its personnel and internal affairs") (internal quotation marks and citation omitted); *Greer*, 424 U.S. at 836-40 (granting deference to commanding officer to control access to public areas of military base when candidates sought access in order to meet with military personnel). Deference is appropriate where the government

needs to organize itself in an institutional manner. *See Green-burgh*, 453 U.S. at 126, 128 (noting that mailboxes must be "under the direction and control of the Postal Service" in order to ensure its efficient operation and that they are "an essential part of the Postal Service's nationwide system for the delivery and receipt of mail"). The regular exercise of control over the administrative activities of a particular entity demonstrates that the government is indeed the manager of that entity. Such pervasive management also lessens the likelihood that a decision made in the course of managing an entity, which results in the exclusion of expressive activity, had as its purpose the suppression of expression.[12] *See Davenport*, 127 S. Ct. at 2381-82 (noting situations involving content-based restrictions of speech that are subject to relaxed scrutiny because they raise no realistic concern over the suppression of ideas).

But even if we were to approach forum analysis from the vantage point Appellants urge, it would not alter our conclusion. It is clear that the State of Idaho does not pervasively manage local government workplaces or local government the payroll deduction programs. Appellants cannot point to any current or previous exercise of control over local governments' administration of their payroll systems, except for the subject statute, § 44-2004(2). Appellants could cite no other situation in which Idaho has attempted to use its asserted powers to manage the day-to-day operations of local government personnel. The unique nature of the State's intervention therefore strongly suggests that the State's purpose here is exactly that against which the First Amendment protects — the denial of payroll deductions for the purpose of stifling political speech. *Cf. R.A.V.*, 505 U.S. at 390. Appellants have failed to establish that local governments' payroll deduction

---

[12]We emphasize, however, that this line of cases depends on *pervasive* management. Mere governmental regulation of the property of others is not enough to permit the government to control expressive content, as *Consolidated Edison* shows, 447 U.S. at 539-40.

programs involve Idaho's discretion and control over the management of its own internal affairs, *see Cornelius*, 473 U.S. at 805, such that the programs should be considered a nonpublic forum of the State.

[9] Much of First Amendment analysis balances interests; forum analysis attempts to balance the interests of the government in controlling access to its property with the speech interests of the parties who wish to gain access to the property. *See Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 572 (1987); *see Hill v. Colorado*, 530 U.S. 703, 718 (2000); *Kokinda*, 497 U.S. at 737 (Kennedy, J., concurring); *Cornelius*, 473 U.S. at 800. In this case, Appellants have established generally that the State of Idaho has the ultimate power of control over the units of government at issue but have not established that the State actually operates or controls the payroll deduction systems of local units of government. This suggests that the State of Idaho did not establish the forum and does not currently operate the forum. Consequently, the State has a relatively weak interest in preventing Plaintiffs from exercising their First Amendment rights as compared to the actual controlling entities.[13]

---

[13]The balancing process associated with forum analysis, a heavily factual inquiry, illustrates the logic of our conclusion. The classification of payroll deduction programs as a particular type of forum, and the attendant First Amendment rights of Plaintiffs with respect to the payroll deduction programs, depend heavily upon the nature of the government's interests in operating the payroll deduction system (as evidenced by stated intent, policy, and practice) and whether the local government workplaces are compatible with the type of expressive activity embodied by politically-oriented payroll deductions. *See Cornelius*, 473 U.S. at 802; *cf. Perry*, 460 U.S. at 47 (looking to facts regarding school district's practice in operating its mail system to determine what type of forum existed); *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1016-21 (D.C. Cir. 1988) (reversing dismissal of complaint and directing district court to examine "objective indicia" of government's intent in operating football stadium). Nowhere has the State shown that it is in a position to provide this information with respect to local government workplaces. Nonpublic forum analysis simply cannot occur here.

**[10]** We therefore conclude that Appellants' assertion that local government payroll deduction systems are nonpublic fora of the State of Idaho is unsupported by law or facts. The public forum doctrine does not apply to Idaho's decision to prevent local government employers from granting an employee's request to make voluntary contributions to political activities through a payroll deduction program. Accordingly, we apply the strict scrutiny analysis described above, and because § 44-2004(2) fails strict scrutiny, we hold the statute unconstitutional as applied to local government employers. The district court's grant of summary judgment in favor of Plaintiffs that Idaho Code § 44-2004(2) is unconstitutional with respect to local units of government, including school districts, is

**AFFIRMED.**