UTAH EDUCATION ASSOCIATION; Utah State AFL–CIO; American Federation of Teachers–Utah; American Federation of State, County, and Municipal Employees Local 1004; Utah School Employees Association; and Professional Firefighters of Utah, Plaintiffs–Appellees,

v.

Mark SHURTLEFF, in his official capacity as Attorney General of the State of Utah, Defendant–Appellant,

and

Sutherland Institute; Utah Taxpayers Association; Evergreen Freedom Foundation; Parents for Choice in Education; National Right to Work Legal Defense Foundation, Inc., Amici Curiae.

No. 06–4142.

United States Court of Appeals, Tenth Circuit.

Jan. 10, 2008.

Nancy L. Kemp, Assistant Utah Attorney General, Salt Lake City, Utah (Mark L. Shurtleff, Utah Attorney General, and Thom D. Roberts, Assistant Utah Attorney General, with her on the briefs), for Defendant–Appellant.

Jeremiah A. Collins, Bredhoff & Kaiser, P.L.L.C., Washington D.C. (Michael T. McCoy and Clover R. Meaders, Utah Education Association, Murray, Utah; Arthur F. Sandack, Salt Lake City, Utah; David J. Strom and Stephanie Baxter, Washington, D.C.; Thomas A. Woodley and Douglas L. Steele, Woodley & McGillivary, Washington, D.C.; Larry P. Weinberg, Washington, D.C., with him on the brief), for the Plaintiffs–Appellees.

Maxwell A. Miller and Scott S. Bell, Parsons Behle & Latimer, Salt Lake City, Utah, filed an amici curiae brief on behalf of Defendant–Appellant.

Before LUCERO and MURPHY, Circuit Judges, and ROBINSON,* District Court Judge.

LUCERO, Circuit Judge.

Utah's Voluntary Contributions Act ("VCA") prohibits any state or local public employer from withholding voluntary political contributions from its employees' paychecks. Utah Code Ann. § 34–32–1.1. Appellees, comprising several Utah labor unions ("Unions"), assert that the VCA violates the First Amendment by restricting public employees' political speech. The district court granted their motion for summary judgment, and the state now appeals.

We agree with the district court's conclusion that the VCA is unconstitutional as applied. State restrictions on payroll systems owned and maintained by independent local governments and school boards do not fall under the nonpublic forum exception to ordinary First Amendment analysis. Because the VCA regulates political contributions, we apply exacting scrutiny and conclude that as applied to municipalities, counties, school districts, and other local public employers, § 34–32–1.1(2)(g) of the Utah Code violates the First Amendment. We **AFFIRM** the judgment of the district court.

---

* The Honorable Julie A. Robinson, United States District Court Judge, District of Kansas, sitting by designation.

## I

Five Utah labor organizations and one association of labor unions brought this suit against Utah Attorney General Mark Shurtleff, seeking a declaration of the VCA's unconstitutionality as applied to all public employers other than the state itself. These organizations represent several thousand Utah public employees, including teachers and other school employees, county and municipal employees, and firefighters. Before the district court, all parties agreed on the following stipulated facts.

Many public employers in Utah facilitate voluntary contributions to labor union political funds by withholding money from an employee's paychecks at the employee's request. In 2001, the Utah legislature attempted to end this practice by enacting the VCA. Under the VCA, public employers are barred from deducting political contributions, including those to labor union political funds, when issuing paychecks. Specifically, the VCA provides that

[a] public employer may not deduct from the wages of its employees any amounts to be paid to: (a) a candidate ...; (b) a personal campaign committee ...; (c) a political action committee ...; (d) a political issues committee ...; (e) a registered political party ...; (f) a political fund ...; or (g) *any entity established by a labor organization to solicit, collect, or distribute monies primarily for political purposes as defined in this chapter.*

Utah Code Ann. § 34–32–1.1(2) (emphasis added).

As defined in the VCA, "political purposes" include any action intended to "directly or indirectly" influence individuals to vote in a particular manner, at "any caucus, political convention, primary, or election." § 34–32–1.1(1)(b). Covered "public employers" include both the state itself and all political subdivisions of the state, such as municipal governments, school districts, and special service districts. § 34–32–1.1(1)(d). These provisions apply prospectively only; the VCA does not invalidate existing payroll deduction agreements between public employers and employees. In a letter to school districts and other public employers, however, Attorney General Shurtleff advised that "[t]he vast majority" of existing school district contracts that he had reviewed contain provisions that would violate the VCA if renewed.

The parties agree that the VCA affects the Unions' fundraising activities. Each union sponsors funds that make expenditures for "political purposes," and many of the Unions' members make voluntary contributions to these funds. In addition, many of their members prefer to contribute using payroll deductions because they find it to be the "easiest, least expensive and most reliable way to do so." Because of the VCA, some of these members will either cease contributing entirely or reduce the amount of their contributions to the union political funds.

Most of Utah's public employers maintain and administer their own payroll systems, and thus the systems at issue are independent from those operated by the State of Utah. Setting up an individual payroll deduction carries "a marginal, although slight" expense. Prior to the VCA, however, public employers rarely, if ever, denied a union member's request to establish a payroll deduction.

On September 29, 2006, the Unions moved for summary judgment, arguing that the VCA as applied to local public employers was an unlawful, content-based restriction on political speech.[1] In a suc-

---

1. Although the Unions' amended complaint contained claims based on both the Free

cinct memorandum opinion, the district court found that the statute violated the First Amendment. Concluding that the VCA restricted speech based on its content, the district court applied strict scrutiny. Because it found that the labor political fund provision was not narrowly tailored to serve a compelling state interest, the court declared the statute unconstitutional.

Utah now appeals, arguing that the payroll systems of local governments and school boards are nonpublic fora and therefore the district court should have applied only reasonableness review. We have jurisdiction to review the final judgment of the district court under 28 U.S.C. § 1291.

## II

### A

■ In a First Amendment case, we review de novo the district court's findings of constitutional fact, conclusions of law, and grant of summary judgment. *Abilene Retail # 30, Inc. v. Bd. of Comm'rs of Dickinson County*, 492 F.3d 1164, 1170 (10th Cir.2007). Because the district court relied entirely on stipulated facts in ruling on the summary judgment motion, only questions of law need be resolved here.

■ Before turning to the First Amendment inquiry, however, we must satisfy ourselves that the payroll deductions affected by the VCA do constitute speech. We begin by observing that political spending produces speech "at the core of the First Amendment." *FEC v. Nat'l Conservative PAC*, 470 U.S. 480, 493, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). Consequently, "contribution and expenditure limits operate in an area of the most fun-

damental First Amendment activities," and have long been reviewed by courts as burdening protected speech. *Buckley v. Valeo*, 424 U.S. 1, 14, 16–17, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *see also Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 657, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). Moreover, contribution regulations need not take the form of absolute dollar limits in order to prompt First Amendment scrutiny; by increasing the effort required to engage in political speech, restrictions on the permissible methods of funding such speech implicate free expression as well. *See FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 252, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (recognizing a burden on speech when legislation allowed the plaintiff to make political expenditures only from a segregated fund); *Pocatello Educ. Ass'n v. Heideman*, 504 F.3d 1053, 1058 (9th Cir.2007) (holding that Idaho's version of the VCA "burden[ed] political speech").

By banning a contribution method preferred by many union members, the VCA increases the difficulty of contributing to labor union political funds. It is thus unavoidable that, to some degree, the VCA burdens political speech. We therefore review the statute under the First Amendment framework for restrictions on political expression.

### B

■ Utah argues that although voluntary payroll contributions qualify as protected speech, the government may impose reasonable limits on speech conducted on its own property. As the Supreme Court has recognized, "existence of a right of access to public property and the standard

Speech Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, the motion for summary judgment only alleged a First Amendment viola-

tion. On appeal, the Unions again argue only that the VCA violates their right to free speech.

by which limitations upon such a right must be evaluated" depend on the nature of the property. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). When the government restricts speech on government property that has traditionally been held open for assembly and debate, or when it voluntarily opens a forum for expressive activity, the restrictions must satisfy strict scrutiny. *Id.* at 45, 103 S.Ct. 948.

■ Conversely, if the forum in question has been reserved for nonexpressive use, the government has a much lower burden. It must simply demonstrate that speech restrictions are "reasonable in light of the purpose which the forum at issue serves." *Id.* at 49, 103 S.Ct. 948. These reasonable restrictions may be based on the subject matter of the speech or the identity of the speaker. *Id.; see also Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). It is this "nonpublic forum doctrine" that Utah urges us to apply to the VCA.

According to the state, the payroll systems are government property intended primarily for a nonspeech purpose, and as such they must be considered nonpublic fora. Therefore, Utah argues, strict scrutiny does not apply, and it need only show that the VCA is reasonable in light of the payroll system's primary purpose: processing paychecks.

In response, the Unions contend that the nonpublic forum doctrine does not apply in this case, because the payroll systems at issue are not property of the *state government* at all. Forum analysis is triggered by the government's regulation of its *own* property, but in this case, the Unions argue, Utah seeks to regulate the expressive use of payroll systems that belong to independent local entities. Accordingly, the Unions assert that the nonpublic forum doctrine is simply inapplicable here, and urge us to apply ordinary strict scrutiny.

No controlling precedent squarely addresses the present situation. On one hand, if the VCA restricted only the state-owned payroll systems of state agencies, we would conduct forum analysis to determine if the government property at issue was indeed a nonpublic forum. *See, e.g., Perry,* 460 U.S. at 44–47, 103 S.Ct. 948 (applying forum analysis to access restrictions imposed by a local government on its own internal mail system); *Wells v. City & County of Denver,* 257 F.3d 1132, 1144–47 (10th Cir.2001) (applying forum analysis to a local government's control over its own holiday display). On the other, if the VCA regulated the payroll systems of private employers, forum analysis would be entirely inapplicable. *See Consolidated Edison Co. of N.Y., Inc. v. Public Serv. Comm'n,* 447 U.S. 530, 539–40, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (declining to apply the nonpublic forum doctrine to even a heavily regulated private entity). Because independent governments are neither private entities, nor clearly a part of the state government itself, we must consider the purposes and previous applications of the nonpublic forum doctrine to determine whether it controls here.

■ At its foundation, the nonpublic forum exception recognizes that "the Government, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439 (quotation omitted); *see also U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129–30, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). Consequently, the nonpublic forum exception applies only "[w]here the government is acting as a proprietor, managing its internal operations, rather than acting as a lawmaker with the power to

regulate or license." *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) ("*ISKCON*").

■ It follows that for the government to impose speech restrictions under the nonpublic forum exception, it must do so only on its own property, and then only when it acts in a proprietary role. For example, when the government owns and maintains mass transit systems, it is "part of a commercial venture," and in that role may impose reasonable restrictions on advertising. *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). So too may the government, when acting as an employer, control participation in an employee charity drive, *Cornelius*, 473 U.S. at 810, 105 S.Ct. 3439; when maintaining an interoffice mail system, control access to that system, *Perry*, 460 U.S. at 53, 103 S.Ct. 948; when operating military facilities for the primary purpose of preparing for war, restrict disruptive speech, *Greer v. Spock*, 424 U.S. 828, 838, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); or when acting as an airport owner, regulate speech-related conduct incompatible with the operation of that facility, *ISKCON*, 505 U.S. at 683, 112 S.Ct. 2701.

By contrast, when a government acts merely as a regulator of an independent entity, public forum analysis does not come into play. In *Consolidated Edison*, the Supreme Court refused to extend the nonpublic forum exception to property owned by a private entity, even though that entity was subject to substantial government oversight. The Public Service Commission of New York had attempted to prohibit a utility company—a monopoly over which it had strong regulatory power—from using customer billing inserts to discuss "political matters." 447 U.S. at 532–33, 534 n. 1, 100 S.Ct. 2326. Rejecting the state's theory that its regulatory power transformed Consolidated Edison's private property into a government forum, the Court held that the Commission's action violated the First Amendment. *Id.* at 543, 100 S.Ct. 2326. In reaching this conclusion, the Court described the nonpublic forum cases as "narrow exceptions to the general prohibition against subject-matter distinctions," justified only by the "special interests of a government overseeing the use of its property." *Id.* at 539, 540, 100 S.Ct. 2326. New York's power to establish and regulate monopolies was simply insufficient to invoke the exception.

■ Because the nonpublic forum doctrine is justified largely by the state's special interest in overseeing the use of its own property, we conclude that a relevant distinction for purposes of the nonpublic forum exception is between property owned and controlled by the government seeking to implement the speech restrictions, and property owned and controlled primarily by independent entities. Utah urges a less nuanced analysis, arguing that we should only consider whether the property at issue is public or private. Because the payroll systems are clearly public property that have not been opened up generally to third parties, the state contends, we must find that they are nonpublic fora. The state, however, can point to no authority invoking the nonpublic forum exception when one government entity regulates the speech of another. Crucially, this argument ignores the justification for the nonpublic forum doctrine previously discussed.

## C

Accordingly, in determining whether we should apply forum analysis to the VCA, we ask whether the forum affected by the VCA is Utah's property. If so, Utah has a "special interest" in controlling speech on that property, and we will apply the nonpublic forum doctrine and reasonableness

review. *See Consolidated Edison*, 447 U.S. at 540, 100 S.Ct. 2326.

To focus our inquiry, we must first define the relevant forum to which the Unions seek access. *See Cornelius*, 473 U.S. at 801, 105 S.Ct. 3439. As we have thus far assumed, the local government payroll systems (rather than, say, local government property in general) constitute the relevant forum for our analysis. *See Perry*, 460 U.S. at 44, 103 S.Ct. 948 (considering teachers' mailboxes, rather than the entire school, to be the relevant forum for purposes of forum analysis); *see also Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439 (counseling a "tailored approach" to defining the parameters of a government forum).

■ Ordinarily, we would next determine whether the forum is public or nonpublic. *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439. But in this case, we must first resolve the dispositive threshold question identified above: Is Utah acting in a proprietary role and controlling its *own* property, or merely regulating third-party property? *See Pocatello*, 504 F.3d at 1062–63. To resolve this question, we must determine whether school boards and local governments are mere arms of the State of Utah, or independent political subdivisions.

Amici urge[2] that because the state possesses unbounded authority over localities—and indeed, because the state legislature has the power to create and destroy these bodies—we must conclude that "school districts, counties and cities in Utah are arms of the State." Accordingly,

the argument goes, we must consider the payroll systems to be state property. Both Utah state law and our circuit's precedent, however, compel the opposite conclusion.

■ We have previously considered the status of local governments in the Eleventh Amendment sovereign immunity context, and these cases directly guide our disposition of this issue. Under the Eleventh Amendment, whether an entity may partake in the state's immunity from suit in federal court depends on whether that entity is "treated as an arm of the state," or is instead "treated as a municipal corporation or other political subdivision." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In order to determine which of the two categories a locality falls into, we consider "the nature of the entity created by state law." *Id.*

With regard to Utah's school districts, our existing precedent holds that the districts are not arms of the state. In *Ambus v. Granite Board of Education*, 995 F.2d 992 (10th Cir.1993) (en banc), we applied the sovereign immunity analysis established in *Mt. Healthy*, and rejected many of the same arguments that amici raise here. Our analysis in *Ambus* considered several factors from *Mt. Healthy*, including the characterization of the district under state law, the guidance and control exercised by the state over the local school board, the degree of state funding received by the district, and the board's ability to issue bonds and levy taxes on its own behalf.[3] 995 F.2d at 994. In reviewing

2. Unlike the state itself, amici apparently recognize that the state must have proprietary control over the forum in question in order for us to conclude that the forum is nonpublic.

3. In *Ambus*, we noted that the third and fourth *Mt. Healthy* factors address whether a

judgment would be paid from the state treasury. *Id.* at 996. Although the school districts, counties, and municipalities in this case are not threatened with a monetary judgment, the source of their funding remains relevant because it indicates whether Utah or its political subdivisions bear the ultimate cost of maintaining the payroll systems.

each of the factors, we concluded that "[b]ecause Utah school districts are considered 'political subdivisions' under Utah law [and] there is significant local board authority over school district operations . . . they are not arms of the state for purposes of the Eleventh Amendment." *Id.* at 997. Because these factors speak to the relationship between the districts and the state, we find them equally significant here and repeat the *Mt. Healthy* analysis, this time extending it to municipalities and counties as well.[4]

First, as to the degree of control exercised by the state, Utah has affirmatively granted substantial independence to its local school districts, cities, and counties. Under state law, school boards "shall have direction and control of all school property in the district," Utah Code Ann. § 53A–2–108(2), and cities "shall have the power" to control their own finances and property, § 10–8–1. Further, the state grants municipal legislative bodies the power to acquire, hold, and convey real and personal property, § 10–8–2(1)(a)(iii). Likewise, as we noted in *Ambus*, "[l]ocal school boards are public corporations that 'may sue and be sued, and may take, hold, lease, sell, and convey real and personal property as the interests of the schools may require.'" 995 F.2d at 996 (quoting § 53A–3–401(3)).

In attempting to contravene this persuasive evidence of local control with regard to school districts, amici note that the state regulates the manner in which districts terminate school teachers. *See* § 53A–8–104. But this example simply proves that Utah has reserved the right to regulate local school districts in specific areas; by

default, general authority rests with local districts. *Cf. Ambus,* 995 F.2d at 996 (noting that although the state school board may establish rules "relat[ing] to the management of the school system in the state as a whole," "local school boards exercise a myriad of responsibilities without control from the state level.").

Next, we consider the characterization of school districts, cities, and counties under Utah law. Amici advance two reasons why we should hold that Utah state law considers cities, counties, and school boards to be arms of the state. First, amici note that under state law, these entities are entitled to sovereign immunity. *See* §§ 63–30d–102, 63–30d–201. We rejected this argument in *Ambus,* noting that state law sovereign immunity does not inform whether localities are arms of the state for federal constitutional purposes. *See* 995 F.2d at 995. Moreover, Utah courts have permitted cities, counties, and school districts to bring suit against the State of Utah, an odd result if they were merely arms of the state. *See Salt Lake City Corp. v. Property Tax Div. of Utah State Tax Comm'n,* 979 P.2d 346, 353 (Utah 1999) (noting "numerous instances in Utah case law where municipalities and school districts have brought claims against other political subdivisions or state agencies").

Second, amici argue that because the state has the power to establish and dissolve municipalities and school districts, they are therefore part of the state itself. Specifically, amici cite § 10–1–201, providing that "[m]unicipalities shall be political

---

4. Because it has long been settled that the Eleventh Amendment does not generally extend to municipalities and counties, we have only infrequently had occasion to apply the *Mt. Healthy* factors to these entities. *See Lincoln County v. Luning,* 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890) ("[A county] is part of the state only in that remote sense in

which any city, town, or other municipal corporation may be said to be part of a state."); *Sonnenfeld v. City & County of Denver,* 100 F.3d 744, 749–50 (10th Cir.1996) (holding that Denver is not an "arm of the state" even when "carrying out state policy in building an airport").

subdivisions of the State of Utah, municipal corporations, and bodies politic with perpetual existence unless disincorporated according to law," and § 53A–2–101, allowing the state to create, merge, and dissolve school districts. The statutes cited, however, actually support local city and school board independence. We do not doubt that these statutes give Utah more power over the establishment and disestablishment of local governments than it would have over private corporations, but that is not the issue here. By defining municipalities as "political subdivisions" and "bodies politic," Utah law recognizes that they are more than merely arms of the state. *See Ambus*, 995 F.2d at 995 (giving substantial weight to statutory and constitutional language describing school districts as "political subdivisions"); Utah Const. Art. XI, § 1 (recognizing Utah counties as "legal subdivisions"); *id.* § 8 (implicitly acknowledging counties, cities, school districts, and special service districts to be political subdivisions); Utah Code Ann. § 63–30d–102(7) (defining "political subdivision" to include counties, cities, school districts, and special service districts for the purposes of the Governmental Immunity Act). In light of the significant autonomy Utah has vested in these localities, we cannot accept that simply because state law permits Utah to create cities and school boards, it must follow that, once created, they are the state.

Finally, we evaluate the extent to which local school boards, cities, and counties are empowered to levy taxes and issue bonds. Under Article XIII, § 5 of the Utah Constitution, the state is forbidden from levying taxes on behalf of political subdivisions, but may authorize these subdivisions to collect taxes on their own behalf. The Utah Supreme Court has "long recognized that the purpose of [this provision] was to ensure the right of the people of Utah to local self-government." *Mountain States Tel. & Tel. Co. v. Garfield County*, 811 P.2d 184, 187 (Utah 1991). Because the Utah Constitution "indicates an intention to have local business transacted and local affairs managed by local authorities," *id.* at 187–88 (quotation omitted), our First Amendment inquiry cannot treat state regulation of local governments as equivalent to state self-regulation.

On the foregoing basis, we hold that Utah counties, cities, and school districts are independent from the state for the purposes of First Amendment analysis, and consequently, the case law addressing government speech restrictions on third party property, rather than on the government's own property, controls. Under *Consolidated Edison*, even if we did regard local payroll systems as falling under state control to some attenuated degree, Utah must still demonstrate that it has the same special proprietary interest in controlling the use of these systems that it would have in property it owns directly.[5] 447 U.S. at 540, 100 S.Ct. 2326. Upon review of the stipulated facts, the *only* interest that Utah has shown in local payroll systems is its attempt, through the VCA, to prohibit their use for political contributions. This one-time restriction of payroll donations simply does not implicate the relevant justification for the nonpublic forum exception—allowing governments the freedom necessary to conduct their own business. Because local governments control the payroll systems as their own property and Utah's sole involvement is

---

5. Even if some overwhelming degree of government regulation could act to transform third-party property into a nonpublic forum, such a circumstance is not present here. *Cf. Council of Greenburgh Civic Ass'ns*, 453 U.S. at 128, 101 S.Ct. 2676 (holding that mailboxes, although paid for by the customer, are an essential part of the Postal Service for purposes of forum analysis).

the imposition of a restriction on political speech, we also hold that forum analysis, and in turn the nonpublic forum exception, does not apply to the VCA.[6]

### III

To ascertain the appropriate level of scrutiny for our review, we must next determine the precise nature of the speech restrictions imposed by the VCA. At the threshold, we usually look to whether the government engages in content- or viewpoint-based discrimination, or instead focuses on content-neutral attributes. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). The district court found that because the VCA restricts only deductions for political purposes, it represents a content-based regulation. Accordingly, the court below applied strict scrutiny and found the provision unconstitutional.

Generally, when the government regulates speech based on content, the highest level of judicial scrutiny applies. *Id.* To withstand this test, the state must show that the regulation is "necessary to serve a compelling state interest, and that it is narrowly drawn to achieve that end." *Burson v. Freeman*, 504 U.S. 191, 198, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). If the VCA restricted traditional speech rather political contributions, such scrutiny might apply here as well. But the VCA regulates political contributions, and the very same precedents which establish that these contributions implicate First Amendment analysis also apply a lower standard of scrutiny than traditional strict scrutiny. *See Buckley*, 424 U.S. at 19–21, 96 S.Ct. 612; *McConnell v. FEC*, 540 U.S. 93, 134, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003).

Our discussion begins with *Buckley*, in which the Supreme Court set forth a general framework for analyzing First Amendment challenges to political contributions and expenditures. Although the Court recognized that restrictions on both contributions and expenditures implicated First Amendment interests, it concluded that expenditure limitations impose a greater burden on protected speech. *Buckley*, 424 U.S. at 16, 23, 96 S.Ct. 612. By contrast, the Court determined that political contributions promote free expression only indirectly, because "[a] contribution serves as a general expression of support ... but does not communicate the underlying basis for the support." *Id.* at 21, 96 S.Ct. 612. Moreover, contributions implicate political speech only when the recipient spends the contributed funds to express a political message; that is, when they "involve[ ] speech by someone other than the contributor." *Id.* As for the recipients of the contribution, the net effect of contribution limits is "merely to require candidates and political committees ... to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression." *Id.* at 21–22, 96 S.Ct. 612. Because contribution limitations have only an indirect effect on the contributor's own speech interests, and do not have a "dramatic adverse impact" on recipients,

---

**6.** In so holding, we reach the same conclusion as the Ninth Circuit in *Pocatello*, 504 F.3d at 1065. We note that the Sixth Circuit has upheld the constitutionality of similar wage deduction restrictions. *Toledo Area AFL–CIO Council, Inc. v. Pizza*, 154 F.3d 307 (6th Cir.1998). In reaching its conclusion, however, the Sixth Circuit assumed that the state was regulating its own payroll systems. *Id.* at 319–20. In contrast, we need not decide here if "the government can place conditions on the receipt of *state-created* benefits that have the effect of dissuading people from exercising a constitutional right." *Id.* at 321 (emphasis added). Instead, we decide only whether the state may place speech restrictions on benefits created by *independent* local governments. Given this important distinction, we do not read our holding as inconsistent with that of our sibling circuit.

*id.* at 24, 96 S.Ct. 612, a "less stringent standard of review applies" to contribution regulations, *Homans v. City of Albuquerque,* 366 F.3d 900, 905–06 (10th Cir.2004). Under this standard, contribution restrictions may be sustained if they survive a somewhat reduced form of exacting scrutiny, that is, if they "are 'closely drawn' to match a 'sufficiently important interest.' " [7] *Randall v. Sorrell,* 548 U.S. 230, 126 S.Ct. 2479, 2491, 165 L.Ed.2d 482 (2006) (quoting *Buckley,* 424 U.S. at 25, 96 S.Ct. 612).

We recognize that the VCA differs from the contribution limits implicated in *Buckley* and its progeny in that campaign finance laws generally place limits on the *size* of permissible political contributions, while the VCA restricts the *means* by which contributions may be made. This distinction makes no difference, however; the *Buckley* framework applies equally when the government bars a method or source of political spending. *See McConnell,* 540 U.S. at 138–39, 124 S.Ct. 619; *Mass. Citizens for Life,* 479 U.S. at 254–56, 107 S.Ct. 616. Because the VCA limits the free expression of both the contributor and contributee only indirectly, the rea-

sons for invoking a less-exacting level of scrutiny are also present here.

With regard to the contributor, the VCA's impact is similar to that of other types of contribution limits: It "leave[s] the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates." *McConnell,* 540 U.S. at 135–36, 124 S.Ct. 619 (quoting *Buckley,* 424 U.S. at 22, 96 S.Ct. 612). In addition, contributing public employees may make a donation of any size, by any means other than a payroll deduction. As to the union political funds, the VCA only requires them to raise money using mechanisms other than payroll deductions, and does not eliminate contributions entirely.

Recognizing that the *Buckley* framework might control here, the Unions contend that the most stringent level of review under that framework—one equal to strict scrutiny—must apply because the VCA "limits the quantity of political speech." [8] Although the Unions are correct that we apply a standard akin to strict scrutiny when reviewing limits on political *expenditures,* that is not the case with respect to political *contributions.* *Ho-*

---

7. *Buckley* and subsequent cases refer to both the level of scrutiny applied to restrictions on political contributions and expenditures as "exacting scrutiny," even though the cases are clear that two different levels of review apply. *See, e.g., McConnell,* 540 U.S. at 134, 124 S.Ct. 619; *FEC v. Colo. Republican Fed. Campaign Comm.,* 533 U.S. 431, 440, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001); *Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 387–88, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000).

8. In addition to lacking support in the case law, this argument fails because it proves too much: all contribution limits, including those which the Supreme Court has squarely reviewed under a reduced level of exacting scrutiny, limit the quantity of political speech in the same attenuated way. As explained, the VCA burdens the quantity of political speech only indirectly, and certainly no more

than other contribution limits to which reduced scrutiny has consistently applied. *See Nixon,* 528 U.S. at 387, 120 S.Ct. 897 (applying a reduced level of exacting scrutiny to limits on contributions by political action committees); *Buckley,* 424 U.S. at 23–38, 96 S.Ct. 612 (applying less stringent exacting scrutiny to several forms of contribution limits). Nor is it true, as the Unions contend, that this level of scrutiny applies only to contributions made directly to a candidate or political party and not to contributions intended to influence elections generally. *See Cal. Med. Ass'n v. FEC,* 453 U.S. 182, 197–98, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (plurality opinion) (holding that limits on contributions to political committees which "advocate the views and candidacies of a number of candidates" induce no greater First Amendment scrutiny than limits on contributions to an individual candidate).

*mans,* 366 F.3d at 906 ("Although a less stringent standard of review applies to limits on political contributions, we conclude that the standard for expenditure limits operates identically to strict scrutiny review."); *see also McConnell,* 540 U.S. at 134, 124 S.Ct. 619; *Colo. Republican Fed. Campaign Comm.,* 533 U.S. at 440 ("Restraints on expenditures generally curb more expressive and associational activity than limits on contributions do."). Because the payroll deductions at issue here are political contributions, rather than direct expenditures, we apply the concomitant level of scrutiny.

## IV

We now apply these principles to the VCA, beginning by reiterating that the First Amendment's "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Nixon,* 528 U.S. at 386, 120 S.Ct. 897 (quotation omitted). Accordingly, although a "less rigorous degree of scrutiny" applies here, *McConnell,* 540 U.S. at 137, 124 S.Ct. 619, the review remains "rigorous" nonetheless, *Buckley,* 424 U.S. at 29, 96 S.Ct. 612. *See also Nixon,* 528 U.S. at 386, 120 S.Ct. 897 (rejecting the application of mere intermediate scrutiny to political contributions); *Randall,* 126 S.Ct. at 2494–95 (invalidating campaign contribution limits under less rigorous exacting scrutiny). With this in mind, we consider whether the VCA is " 'closely drawn' to match a 'sufficiently important interest.' " *Id.* at 2491 (quoting *Buckley,* 424 U.S. at 25, 96 S.Ct. 612).

 In its briefs, Utah focuses primarily on the nonpublic forum exception and reasonableness review, and offers little argument supporting an important government interest in the VCA. Utah does aver in general terms, however, that the VCA avoids "[d]isruption of government workplaces by partisan politics." Although a politically neutral workplace might constitute a sufficient government interest under a mere reasonableness test, *see Cornelius,* 473 U.S. at 809, 105 S.Ct. 3439, it fails under exacting scrutiny. Generally, the only accepted justification for contribution limits has been the government's interest in combating political corruption and the appearance thereof, an interest which "directly implicates the integrity of our electoral process" by "eroding . . . public confidence." *McConnell,* 540 U.S. at 136, 124 S.Ct. 619 (quotations omitted); *see also Nixon,* 528 U.S. at 388–89, 120 S.Ct. 897; *Buckley,* 424 U.S. at 25–27, 96 S.Ct. 612; *Homans,* 366 F.3d at 907–08. Utah has shown no such risk of corruption here, and its interest in a politically neutral workplace is hardly of comparable importance.

In addition, Utah has failed to meet its evidentiary burden on this point. Although the government need not demonstrate the existence of its avowedly important interest through irrefutable proof, courts have never accepted "mere conjecture as adequate to carry a First Amendment burden." *Nixon,* 528 U.S. at 392, 120 S.Ct. 897. We expect Utah to provide at least *some* foundation in the record for its proposition that political payroll deductions disrupt the government workplace, but Utah has presented no evidence in support of its contention.

Finally, the VCA is not "closely drawn" to serve the alleged government interest. Utah cannot explain in any coherent manner how a prohibition on payroll deductions will reduce politicization in the workplace. Indeed, the Unions argue convincingly that the opposite may actually occur. By removing the arrow of automatic payroll deductions from the Unions' fundraising quiver, the VCA may well force the Unions to rely increasingly on repeated, in-person solicitations of its members. Consequently, the VCA could conceivably *increase* the politicalization of public workplaces.[9] In addition, Utah has

9. We recognize that Utah municipal and county employees are barred from soliciting

not explained, nor can we imagine, how the VCA's narrow prohibition on a specific mechanism for political contributions will increase overall political neutrality among employees. Even if we could accept Utah's interest in a nonpolitical workplace as sufficiently important, we cannot agree that the VCA is closely drawn to match that interest. *See Randall*, 126 S.Ct. at 2492–93 (concluding, upon "independent[ ] and careful[ ]" review of the record, that Vermont's contribution limits were not closely drawn to match the state's interests).

Utah also cites a slew of state laws regulating the political activities of government employees. Rather than distinguish each statute individually, we reject Utah's argument of constitutionality by association with several observations. First, the statutes cited generally cover only the political solicitations and contributions of civil servants; in that context, the government may permissibly enact laws that combat the appearance of political favoritism and prevent political officeholders from pressuring their subordinates into contributing to their campaigns. *See U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 565–66, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). By contrast, the VCA extends more broadly to schoolteachers and other employees who would not fall under any of the cited statutes. *Cf.* Utah Code Ann. § 10–3–1108(2) (restricting political activity of municipal employees); § 17–33–11 (restrict political activity of county employees).

Second, unlike these laws from other states, the VCA does not bar political conduct, but rather eliminates only one specific method of making contributions to general purpose political funds. Unlike these

statutes, then, the VCA is a radically underinclusive tool for reducing political pressure in the workplace.

Third, many of these statutes regulate only the public aspects of political activity. The government may assuredly bar public political expression by certain employees in order to reduce pressure from superiors and promote harmony both within a department and with the public at large. *See Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1273–74 (10th Cir.1998) (barring the display of political signs on police officers' lawns). Such interests are not implicated here, because as the district court noted, "the decision to contribute to a political activity by means of payroll deductions is a private matter between the employer and employee."

Fourth, and most tellingly, Utah argues only that "[n]one of these statutes has been held unconstitutional" without citing any judicial authority establishing their constitutionality, much less articulating precedential reasoning applicable to the VCA. As none of the cited statutes parallel the VCA, their mere existence cannot alter our conclusion that the VCA is not closely drawn to match a sufficiently important interest.

**V**

We conclude that as applied to local school districts, municipalities, counties, and other political subdivisions, Utah Code § 34–32–1.1(2)(g) violates the First Amendment. Accordingly, we **AFFIRM** the judgment of the district court.

---

political contributions during work hours. *See* Utah Code Ann. §§ 10–3–1108(1)– 1108(2)(c), 17–33–11(5). These restrictions, however, do not apply to school district em-

ployees, and further, the parties have not cited authority indicating that these limitations even apply to solicitations for the Unions' multipurpose political funds.